IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2013 MAY 14 AM 9: 32

CLERK_____
S. DIST. OF GA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 112-242 |
| | ) | |
| ADRIAN DIAZ-FONSECA | ) | |
| JOSE RIVEA MONTANO | ) | |

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has charged Defendants Adrian

Diaz-Fonseca ("Diaz-Fonseca") and Jose Rivea Montano ("Montano") with one count of

conspiracy to distribute and possess with intent to distribute 50 grams or more of

methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1)

and (b)(1) and § 846, as well as one count of possession with intent to distribute 50 grams or

more of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C.

§§ 841(a)(1) and (b)(1)(A) and (B), and 18 U.S.C. § 2.[1] (Doc. no. 4, pp. 1-2, 3-4.) The matter

is now before the Court because Diaz-Fonseca and Montano have moved to suppress all

evidence arising from a traffic stop of the vehicle in which they were traveling on April 20,

2012. (Doc. nos. 139, 140.) The government filed responses in opposition to the motions.[2]

---

[1] Diaz-Fonseca and Montano are charged in a multiple-count indictment that also
contains charges against five other co-defendants. (Doc. no. 4.) The indictment also includes
a forfeiture allegation against Diaz-Fonseca and Montano and their co-defendants. (Id.)

[2] While filed separately, the government's two responses are identical. (See doc. nos.
152, 153.)

(Doc. nos. 152, 153.) As exhibits to their motions, both Defendants submitted copies of the incident report regarding the April 20th encounter and a "Consent to Search" form signed by Diaz-Fonseca on that date. (Doc. nos. 139-1, 139-2, 140-1, 140-2.) The Court held an evidentiary hearing on the matter, which began on March 21, 2013, and was continued to and completed on April 30, 2013.[3] At the hearing, the Court heard testimony from Deputy Clay Hammond and Deputy Jared Land of the McDuffie County Sheriff's Office.[4] The parties submitted twenty-one exhibits at the hearing, including two video recordings of the April 20th traffic stop, (see Government's (hereinafter "Gov't's") Exs. 19, 20). For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Diaz-Fonseca's and Montano's motions to suppress be **DENIED**.[5] (Doc. nos. 139, 140.)

## II.    FACTS

### A.    Briefing at Georgia Bureau of Investigation Office in Thomson

At around 3:00 a.m., on April 20, 2012, at the Thomson office of the Georgia Bureau of Investigation ("GBI"), Deputy Hammond and Deputy Land attended a briefing with several other law enforcement officers, including GBI agent Pat Morgan ("Agent Morgan"). (FTR 1,

---

[3]The hearing was continued at the request of counsel for Defendants after it was revealed at the March 21st proceedings that one of the government's witnesses provided an additional video of the stop to the government the morning of the hearing, so that counsel for Defendants could have sufficient time to review the video.

[4]Diaz-Fonseca and Montano invoked the Rule of Sequestration at the hearing.

[5]Both Diaz-Fonseca and Montano originally filed preliminary motions to suppress which did not comply with the specificity requirements of Loc. Crim. R. 12.1. (Doc. nos. 127, 128.) The Court thus directed both Defendants to file particularized motions. (Doc. nos. 133, 134.) Because they subsequently filed the particularized motions discussed herein, the Court **REPORTS** and **RECOMMENDS** that the preliminary motions be deemed **MOOT**. (Doc. nos. 127, 128.)

2:38:30-38: 45, 2:38:48-39:02; FTR 2, 2:12:00-12:16, 3:08:30-08:43.)[6] During the briefing, the deputies were informed that a red or burgundy Chevrolet[7] with a Georgia tag would be traveling eastbound on Interstate 20 ("I-20") in McDuffie County that morning between 5:00 and 6:00 a.m., and that the vehicle would contain methamphetamine. (FTR 1, 2:39:06-39:28, 2:39:40-39:49; FTR 2, 3:08:44-08:55, 3:09:06-09:28.) Deputy Hammond also testified that he recalled being told at the briefing that a person with the last name Fonseca would be the driver or a passenger, (FTR 1, 2:40:00-40:08), while Deputy Land testified that he recalled being informed that the vehicle would be occupied by Hispanics and that he wrote down the name "Miguel Fonsesco," (FTR 2, 3:09:06-09:45, 4:15:00-15:10). The deputies were also informed that the methamphetamine would likely be stored in the front bumper area of the vehicle and could be retrieved from its location by use of a water hose. (FTR 2, 2:20:02-20:09, 3:21:00-21:10, 3:21:25-21:35.)

### B. Deputy Hammond Observes Traffic Violation and Initiates Stop

After the briefing, both deputies, as well as Agent Morgan, took positions on I-20 eastbound waiting for the vehicle: Deputy Hammond waited at mile marker 169, Deputy Land at 168.5, and Agent Morgan at 165.[8] (FTR 1, 2:40:20-40:30; FTR 2, 3:09:56-10:10.) Agent

---

[6] Although a transcript of the hearing held on March 21st and April 30th has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR"). The Court will refer to the proceedings from March 21st as "FTR 1" and those from April 30th as "FTR 2."

[7] Deputy Hammond testified that he recalled being informed at the briefing that the vehicle would possibly be a Malibu, (FTR 1, 2:39:06-39:28), while Deputy Land testified that he recalled that the vehicle would possibly be an Impala, (FTR 2, 3:09:06-09:15).

[8] Deputy Land testified that the numbers of the miles increase as one travels eastbound on I-20. (FTR 2, 3:10:12-10:22.)

Morgan then radioed to Deputy Hammond and Deputy Land that a vehicle matching the description passed him, and Deputy Land radioed the same at around 5:10 a.m. (FTR 1, 2:40:46-41:04; FTR 2, 3:10:40-11:03.) Deputy Hammond saw the vehicle between 5:10 and 5:13 a.m., and he pulled onto I-20 to follow it. (FTR 1, 2:41:04-41:18, 2:41:30-41:36.)

While he was following the vehicle, Deputy Hammond observed that it failed to maintain its lane: the driver's side tires of the vehicle, which was traveling in the right-hand lane, drove onto the center line, touching "several dotted lines."[9] (FTR 1, 2:41:36-41:46; FTR 2, 2:17:05-17:30, 2:17:55-18:07.) Deputy Hammond's patrol car was equipped with video equipment, (FTR 1, 2:53:00-53:05), and he testified that he believed the failure to maintain lane was captured on video,[10] (FTR 1, 2:54:23-54:40). The government submitted the video from Deputy Hammond's patrol car which, according to its time stamp, begins at 5:14:36 on April 20, 2012, and ends at 5:56:19 on the same day. (Gov't's Ex. 20.) At about 5:14:50, the video shows that the vehicle occupied by Diaz-Fonseca and Montano begins to drift to its left toward the center line, and from 5:15:00 to 5:15:05, the vehicle can be seen driving on the center line.

Before he initiated the traffic stop, Deputy Hammond also called the tag in to the Sheriff's Office, and he was informed that the vehicle was registered to a person with the last

---

[9]Deputy Hammond explained on cross-examination that he has stopped people for the "same action" in the past in order to see if their driving abilities are impaired, and that driving on the center line, crossing the center line, or touching the fog line, even if only one time, constitutes a failure to maintain one's lane. (FTR 2, 2:35:52-36:00, 2:37:06-37:53.) Deputy Land likewise testified on cross-examination that touching the center line, even if only once, constituted failure to maintain one's lane and that he would stop a vehicle that he witnessed do so. (FTR 2, 4:16:48-17:35.)

[10]On cross-examination, however, Deputy Hammond stated that it was possible that part or all of the violation was not on the video. (FTR 2, 2:18:15-18:24.)

name "Fonseca." (FTR 1, 2:41:46-42:31; FTR 2, 2:40:25-40:55.) Deputy Hammond then activated his patrol car's blue lights to initiate a traffic stop of the vehicle around Exit 172.[11] (FTR 1, 2:42:00-42:07.)

### C. Traffic Stop and Verbal Request for Consent

After he stopped the vehicle, Deputy Hammond approached the driver's side and began speaking with the driver, Diaz-Fonseca, asking him if he was on any medications or other substances that might cause him to be impaired. (FTR 1, 2:42:46-42:58.) While Deputy Hammond was talking to Diaz-Fonseca, Deputy Land arrived, and Deputy Hammond asked Diaz-Fonseca to exit the vehicle. (FTR 1, 2:42:58-43:10; FTR 2, 3:12:50-13:00.)

When he arrived, Deputy Land went to the passenger side of the vehicle and began speaking to Montano. (FTR 1, 2:44:52-45:00.) Upon approach, Deputy Land saw air fresheners and a picture of "La Santa Muerte" hanging from the rearview mirror. (FTR 2, 3:23:07-23:19.) According to Deputy Land, who had nearly fifteen years of law enforcement experience at the time of the stop, (FTR 2, 4:16:14-16:40), he had learned through numerous interdiction conferences and classes that "La Santa Muerte" was a saint worshiped by Hispanic narcotics traffickers. (FTR 2, 3:23:19-23:32, 4:20:05-20:15.) When Deputy Land asked him for identification, Montano gave him a Mexican identification card with his picture and his name. (FTR 2, 3:13:04-13:30.) Deputy Land observed that Montano spoke "broken English" and that he was very nervous: he was breathing heavily, he had a "thousand yard stare," and the carotid artery in his neck was visibly pulsating. (FTR 2, 3:13:30-13:55.)

---

[11]According to Deputy Hammond, he stopped the vehicle both because of the failure to maintain lane and because he believed he had reasonable suspicion to stop the vehicle based on the information he received at the GBI briefing. (FTR 2, 2:13:22-13:33.)

Meanwhile, Deputy Hammond informed Diaz-Fonseca that he was getting a warning for failure to maintain lane, obtained his driver's license, and began filling out the warning. (FTR 1, 2:44:14-44:29.) Deputy Land joined the two men and began talking to Diaz-Fonseca while Deputy Hammond was completing the warning. (FTR 1, 2:44:30-44:39.) As he drafted the warning, Deputy Hammond asked Diaz-Fonseca whether he still lived in Arizona (the state that issued his driver's license), while Deputy Land asked him what his travel plans were and about his business in McDuffie County. (FTR 1, 2:45:15-45:25; FTR 2, 3:14:45-15:30.) After he had Diaz-Fonseca sign the warning, as he was tearing out Diaz-Fonseca's copy, Deputy Hammond asked him whether he was transporting anything illegal and if the deputies could search his vehicle. (FTR 1, 2:46:35-46:48; FTR 2, 2:21:22-22:04.) Diaz-Fonseca answered affirmatively to Deputy Hammond's request for consent to search. (FTR 1, 2:46:50-46:54; FTR 2, 2:41:22-41:30.)

As noted earlier, Deputy Hammond's patrol car contained video equipment which captured a majority of the stop, including the verbal request for consent. (Gov't's Ex. 20.) The video shows that Deputy Hammond initiated the stop by activating his blue lights at about 5:15:05. After both vehicles have come to a complete stop on the side of I-20, Deputy Hammond approaches the driver's side door and asks the driver, Diaz-Fonseca, for his driver's license from 5:15:54 to 5:16:10. Deputy Hammond continues to stand at the window, talking to Diaz-Fonseca, but the conversation is largely inaudible due to road noise. He can be heard, however, asking whether there are any guns or knives in the car at 5:17:55. Meanwhile, Deputy Land walks up to the passenger side at 5:17:35.

Deputy Hammond then has the driver get out and walks him to his patrol car at 5:18:20. Deputy Land comes over and begins talking to Diaz-Fonseca at 5:18:57. Deputy

6

Hammond gives Diaz-Fonseca his license back at 5:19:05, while Deputy Land continues talking to him. Deputy Hammond appears to begin filling out the warning at 5:19:18, but he walks out of frame at 5:19:20. While Deputy Land and Diaz-Fonseca talk about his brother, Miguel Fonseca, for the next two minutes, Deputy Hammond is not entirely visible.[12] At 5:21:17, however, Deputy Hammond then begins talking to Diaz-Fonseca, asking him if he still lives in Phoenix, and telling him that he needs to update his license because he now lives in Georgia. Deputy Hammond also asks Diaz-Fonseca his birthday and the year of his car from 5:22:05 to 5:22:34.

Deputy Land, who had previously gone back to the car to talk to Montano, returns at 5:22:50 and begins talking to Diaz-Fonseca about how nervous Montano seems. At 5:23:53, Deputy Hammond interjects and begins explaining the warning to Diaz-Fonseca, and has him sign it at 5:24:00. Diaz-Fonseca finishes signing at 5:24:12, and he hands the warning back to Deputy Hammond. After being handed back the warning, Deputy Hammond then tucks his pen into his shirt pocket and asks if there is anything illegal in the car and if Diaz-Fonseca minds if they search his car. Diaz-Fonseca answers at 5:24:20, less than ten seconds after signing the warning and nine minutes and fifteen seconds after Deputy Hammond initiated the stop, "Yeah, go ahead." Deputy Hammond hands Diaz-Fonseca his copy of the warning at 5:24:55.

### D. Deputy Land Obtains Consent in Writing

After Diaz-Fonseca told the deputies they could search his vehicle, Deputy Land then began questioning him about whether he was carrying any contraband. (FTR 2, 3:16:24-

---

[12]While a video from Deputy Land's vehicle was also recording this portion of the stop, Deputy Hammond is not visible on that video either. (See Gov't's Ex. 19.)

16:40.) Deputy Land also obtained a consent form used by the McDuffie County Sheriff's Office that has sections written in both English and Spanish. (FTR 2, 3:16:40-17:08.) After reading the form to Diaz-Fonseca in English, Deputy Land had him sign the form and directed him where to do so. (FTR 2, 3:17:45-17:57.) While Deputy Land testified that Diaz-Fonseca had spoken to the deputies in English exclusively throughout the stop and told them he was born in the United States, (FTR 2, 4:47:20-48:10), Diaz-Fonseca signed the portion of the form written in Spanish, (see doc. no. 140-2).[13] During this time, Deputy Hammond asked Montano to step out of the vehicle. (FTR 2, 3:18:08-18:18.)

Deputy Land's patrol car was also equipped with video equipment, and he manually activated his video recorder as he attempted to catch up to Deputy Hammond on I-20. (FTR 2, 3:11:55-12:25). Deputy Land's video, which also contains a time stamp, begins at 5:18:20 a.m., on April 20, 2012, and ends at 6:09:36 a.m., on the same day.[14] (Gov't's Ex. 19.) The video shows that, after Diaz-Fonseca told the deputies they could search his vehicle, Deputy Land proceeded to ask him if he was carrying any drugs or other types of contraband, such as bootleg DVDs. Deputy Land then begins filling out the written consent form at 5:27:35. At 5:29:18, Deputy Land explains the consent form to Diaz-Fonseca in English, including telling him that he was giving the deputies consent to search the vehicle and that he had "the right to

---

[13]Diaz-Fonseca also requested that the Court utilize the services of the interpreter at the hearing to determine whether the English and Spanish portions of the consent form were consistent with each other. (FTR 2, 4:49:54-52:24.) The interpreter explained that, while the Spanish was "kind of confusing" and appeared to have been translated from English by a computer rather than a person, it was a direct translation, and a person who speaks and reads Spanish would be able to understand it. (FTR 2, 5:00:15-01:10.)

[14]The Court notes, based on a comparison of the time stamps on the two videos, that Deputy Land's appears to be about one minute and fifty-one seconds ahead of Deputy Hammond's.

refuse the search," as provided on the form. (See doc. no. 140-2.) Deputy Land directed Diaz-Fonseca where to sign, and at 5:29:50, about twelve minutes and fifty-five seconds after Deputy Hammond initiated the traffic stop, Diaz-Fonseca signed the consent form.

### E.    Canine Sniff and the Search of the Vehicle

After Diaz-Fonseca signed the consent form, Deputy Land had his canine, "PC," perform a free-air sniff of the vehicle. (FTR 2, 3:19:45-19:53.) Deputy Land, who at the time of the hearing had been a certified handler of canines for 15 years and was on his third certification with PC, testified that PC is a "passive" dog who alerts by sitting down. (FTR 2, 3:19:00-19:38.) According to Deputy Land, PC alerted at the passenger door seam. (FTR 2, 3:19:53-20:30.) Both videos of the stop show that PC sits down somewhere along the passenger side and then jumps toward the car at the same spot.[15] (Gov't's Ex. 19, 5:32:46-32: 50; Gov't's Ex. 20, 5:30:55-31:03.) After the positive alert, Deputy Land told Diaz-Fonseca that the deputies were going to put Montano in the patrol car, and he asked Diaz-Fonseca to explain what the deputies were doing to Montano in Spanish, including specifically informing Montano that he was not under arrest. (Gov't's Ex. 19, 5:33:40-34:41; FTR 2, 3:18:12-18:30.)

Deputy Land then conducted a hand-search of the vehicle, beginning on the passenger side. (Gov't's Ex. 19, 5:35:05-52:05.) Deputy Land testified that he was advised at the GBI GBI briefing not to go directly to the front bumper so as not to reveal the source of the information given to law enforcement. (FTR 2, 3:21:45-22:20; 3:22:35-22:50.) He first found a hose in the spare tire compartment of the trunk that had a "plastic plunger" on the end. (FTR

---

[15]Diaz-Fonseca is blocking the view of the passenger side in Deputy Land's video, (Gov't's Ex. 19, 5:32:46-32:50), however, while the angle from Deputy Hammond's car simply makes it difficult to tell where along the passenger side the dog is alerting, (Gov't's Ex. 20, 5:30:55-31:03).

2, 3:23:45-24:15.) As he continued, he then observed a triangular tube behind the spoiler in the front of the car that had a black duct-taped item stuffed inside. (FTR 2, 3:24:50-25:20.)

After seeing this package, Deputy Land placed Diaz-Fonseca into handcuffs. (FTR 2, 4:10:37-10:48.) Later, using the hose, both deputies were able to retrieve the package from the car.[16] (FTR 2, 3:25:21-25:33.) Deputy Land testified that he was informed at the GBI briefing to use the hose to retrieve the package. (FTR 2, 3:25:36-25:40.) When the package was later opened, the substance inside field tested positive as methamphetamine. (FTR 2, 3:33:28-33:35.)

## III. DISCUSSION[17]

### A. Initial Traffic Stop Lawful

Diaz-Fonseca and Montano dispute the constitutionality of the initial traffic stop. Specifically, at the hearing, counsel for Diaz-Fonseca contended that it was "questionable" whether a traffic violation occurred and that Deputy Hammond did not have reasonable suspicion to justify a stop based on the GBI briefing, as the reliability of the source of information for that briefing was not known, while counsel for Montano argued that Diaz-Fonseca's failure to maintain lane would not ordinarily have prompted a police officer to stop the vehicle. (See FTR 2, 4:54:40-55:26, 4:58:40-59:10.)

Where a party moves for the suppression of evidence, the movant bears the initial

---

[16]The video from Deputy Land's patrol car shows that, at 5:52:05, he orders Diaz-Fonseca to the ground. (Gov't's Ex. 19.) At 6:01:25, after getting help from Deputy Hammond to retrieve it, Deputy Land is seen carrying a black package from the vehicle. (Id.)

[17]Here, while Diaz-Fonseca and Montano submitted separate motions to suppress, the government filed an identical response to both, and the Court held a single evidentiary hearing for both motions. Thus, the Court will consider both motions together.

burden of showing that he was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that the search or seizure was justified. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[18]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975). Moreover, a traffic stop of a vehicle is constitutional if it is based on probable cause to believe that a traffic violation has occurred or if officers have "reasonable, articulable suspicion" that an individual is engaged in criminal activity. United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (*per curiam*) (quoting United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000)).

### 1. Probable Cause to Believe Traffic Violation Had Been Committed

Diaz-Fonseca and Montano first question whether Deputy Hammond had probable cause to believe a traffic violation had been committed before he stopped their vehicle on the morning of April 20, 2012.

"A driver must maintain a lane of traffic in Georgia." United States v. $175,722.77, in United States Currency, more or less, 307 F. App'x 257, 259 (11th Cir. 2007) (*per curiam*) (citing O.C.G.A. § 40-6-48).[19] Specifically, under Georgia law, an officer has probable cause to believe a violation of O.C.G.A. § 40-6-48(1) has occurred, and he may initiate a traffic stop,

---

[18] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[19] O.C.G.A. § 40-6-48 provides, in relevant part:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

when a vehicle drives on to the center line of the road. See Semich v. State, 506 S.E.2d 216, 218 & n.8 (Ga. Ct. App. 1998) (noting that "weaving out of one's lane justifies a stop" and "constitutes a traffic violation," including "weaving onto the center line"); see also Acree v. State, 737 S.E.2d 103, 105 (Ga. Ct. App. 2013) (noting that police officer's stop was justified under O.C.G.A. § 40-6-48(1) when video showed that defendant "touched the centerline, drifted back, and then touched the right fog line.").

Here, the video taken from Deputy Hammond's car shows that Defendants' vehicle begins drifting toward the center line, and, for about five seconds, the tires on the driver's side ride on the center line, immediately after which Deputy Hammond initiates the traffic stop.[20] (Gov't's Ex. 20, 5:14:50-5:15:05.) Counsel for Montano attempted to establish at the hearing that Deputy Hammond was actually motivated to stop Defendants solely by his suspicion that they were involved in narcotics trafficking. To the extent he disputes that a traffic violation occurred, however, this is flatly belied by the video evidence and the uncontradicted testimony of Deputy Hammond. With that established, the Court need not engage in any speculation about Deputy Hammond's actual subjective reason for stopping Defendants. As the Supreme Court has made abundantly clear, where there is probable cause to believe a traffic offense has occurred, the officer's subjective intent when initiating the stop is irrelevant to the Fourth

---

[20]As noted earlier, counsel for Diaz-Fonseca contended at the hearing that it was "questionable" whether the video showed a violation. Deputy Hammond testified that he thought the video would show the violation, (FTR 1, 2:54:23-54:40), but that it was possible that the violation he witnessed occurred before the video began recording, (FTR 2, 2:18:15-18:24). While the Court does not find the video to be unclear on this point, Deputy Hammond also offered uncontradicted testimony that he witnessed the vehicle touch the center line, which prompted him to initiate the stop. (FTR 1, 2:41:30-41:46; FTR 2, 2:17:05-18:07).

Amendment inquiry.[21] See Whren v. United States, 517 U.S. 806, 813 (1996). Thus, the Court easily concludes that Deputy Hammond had probable cause to believe that Diaz-Fonseca violated § 40-6-48(1), and that his subsequent initiation of a traffic stop was lawful on that basis alone. See Harris, 526 F.3d at 1337.

### 2.    Reasonable Suspicion to Stop Vehicle

While the Court has comfortably concluded supra that Deputy Hammond had a lawful basis to stop the vehicle based on a traffic violation, the Court also finds that Deputy Hammond could have lawfully stopped the vehicle regardless of the violation based on the briefing he and Deputy Land received that morning.

As the Court's analysis here turns on the GBI briefing the deputies received, however, the Court must first address a threshold issue raised by counsel for Montano at the hearing: that the GBI briefing was not mentioned in Deputy Land's arrest report, which was the only report either deputy prepared concerning the April 20th encounter. (FTR 2, 2:09:35-09:46, 4:13:12-13:25.) While that is correct, (see generally doc. no. 139-1), the Court notes that "[t]he mere fact that an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible." United States v. Smith, 688 F.3d 730, 734 n.10 (11th Cir. 2012) (quoting United States v. Mendoza, 677 F.3d 822, 828 (8th Cir. 2012)). Rather, the issue is one of credibility, as both deputies offered testimony at the hearing about what they were told at the GBI briefing, and there was no other account of that briefing in the record.

---

[21]In any event, as discussed in greater detail infra, see Part III.A.2, even if Deputy Hammond was in fact motivated to stop the car because it matched the description given in the briefing, that offers no help to Defendants, because that was also a lawful basis for stopping the vehicle.

Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits the deputies' testimony about the information they were given at the GBI briefing for three reasons. First, each deputy's account of the briefing was consistent with the other's, with the slight differences noted in greater detail above. (Compare FTR 1, 2:38:30-39:02, 2:39:06-39:28, 2:39:40-39:49, 2:40:00-40:08; FTR 2, 2:12:00-12:16 (Hammond's testimony) with FTR 2, 3:08:30-43, 3:08:44-08:55, 3:09:06-09:45, 3:21:00-21:10, 3:21:25-21:35 (Land's testimony).) Second, the deputies' accounts of the briefing were also internally consistent, and remained so during cross-examination. (See FTR 2, 2:14:55-14:58, 15:27-15:42, 16:00-16:05, 16:24-16:32, 20:20-20:36 (cross-examination of Hammond); 4:13:40-15:10 (cross-examination of Land).) Finally, Deputy Land's conduct during his search of the vehicle, particularly his decision to use the hose he found in the trunk to attempt to retrieve the package out of its location in the front of the car, corroborates the deputies' testimony that they had been told about where the narcotics were likely to be hidden in the car and how to retrieve them. (See FTR 2, 2:20:02-20:09, 3:21:00-21:10, 3:21:25-21:35, 3:25:36-25:40.)

With the credibility issue resolved, the Court notes that police officers may conduct a

14

brief investigatory stop where they have "reasonable, articulable suspicion" that an individual is engaged in criminal activity. Harris, 526 F.3d at 1337 (quoting Powell, 222 F.3d at 917). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry v. Ohio, 392 U.S. 1, 21 (1968); see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999).

Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), it does require "more than just a hunch." United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) (quoting United States v. Lee, 68 F.3d 1267, 1271 (11th Cir. 1995)). The officer must be able to articulate some minimal, objective justification for the investigatory detention. United States v. Acosta, 363 F.3d 1141, 1145 (11th Cir. 2004); United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989). Reasonable suspicion for a stop can be based on the "collective" knowledge of all the officers involved in the stop, Acosta, 363 F.3d at 1145, and officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Moreover, officers may use a tip to develop reasonable suspicion, so long as the tip exhibits "sufficient indicia of reliability." Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting Alabama v. White, 496 U.S. 325, 332 (1990)). For example, the Supreme Court concluded in White that where an anonymous tip correctly predicted not only "easily obtained facts and

15

conditions," but also the suspected cocaine transporter's "future behavior" – the time she would leave a particular apartment building and the location to which she would then be traveling – it was sufficiently reliable to provide officers reasonable suspicion to stop her vehicle. 496 U.S. at 331-32; see also United States v. Woods, 385 F. App'x 914, 918 (11th Cir. 2010) (per curiam) (where confidential informant accurately provided the color, make, and model of the suspected drug trafficker's car, and that he would be at a particular location around noon that day, officers had reasonable suspicion to stop vehicle matching description at that location); cf. J.L., 529 U.S. at 271 (anonymous tip which provided "no predictive information" and no other basis for its assertion that a young black male in a plaid shirt standing at a bus stop was carrying a weapon was not sufficiently reliable to justify Terry stop).

Here, there can be no doubt that Deputy Hammond had reasonable suspicion to stop the vehicle. The source correctly predicted that a red Chevrolet bearing a Georgia tag would be traveling eastbound on I-20 between 5:00 and 6:00 a.m., and that someone with the last name "Fonseca" or "Fonseco" would occupy or be involved with the vehicle, which Deputy Hammond confirmed by checking the vehicle's registration. (FTR 1, 2:38:30-39:02, 2:39:06-39:28, 2:39:40-39:49, 2:40:00-40:08, 2:41:46-42:07; FTR 2, 2:12:00-12:16, 2:40:45-40:55, 3:08:30-08:55, 3:09:06-09:45, 4:15:00-15:10.) Thus, while counsel for Diaz-Fonseca contended at the hearing that the source of the information was unknown and its reliability uncertain, Deputy Hammond corroborated the tip before initiating the stop, and "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal quotation marks omitted). Because the source also indicated that the vehicle would be transporting methamphetamine, Deputy Hammond had reasonable suspicion

to conduct a brief investigatory stop of the vehicle. See White, 496 U.S. at 331-32.

Therefore, regardless of whether any traffic violation occurred on the morning of April 20th, the Court also concludes that Deputy Hammond had a lawful basis to stop the vehicle based on the reasonable suspicion acquired as a result of the GBI briefing that morning. See Harris, 526 F.3d at 1337. In sum, the initial stop was lawful and provides no basis for suppressing the evidence subsequently seized during the stop.

### B.     Consent Requested During Lawful Stop

Diaz-Fonseca and Montano also contend, without conceding that the initial stop was lawful, that the deputies unlawfully prolonged the stop beyond its initial purpose – to address a traffic violation – by questioning Diaz-Fonseca and "fishing" for criminal activity. (Doc. no. 139, pp. 5-6; doc. no. 140, pp. 5-6.) The defendants thus argue that the consent given by Diaz-Fonseca during the unlawfully extended stop was invalid. (See id.) The government contends, however, that the consent was requested before the initial purpose for the stop – the traffic violation – was completed, or, alternatively, that the deputies had reasonable suspicion to prolong the stop beyond addressing the initial traffic violation. (See doc. no. 152, pp. 3-6.)

"Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest," and is thus analyzed under the standard articulated in Terry. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). To be constitutionally reasonable, a Terry stop "must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty., 542 U.S. 177, 185 (2004) (internal quotation marks and ellipsis omitted). Moreover, "the *duration* of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Purcell, 236 F.3d at 1277 (citing Pruitt,

174 F.3d at 1219). In other words, the stop "may not last 'any longer than necessary to process the traffic violation' unless there is reasonable suspicion of other illegal activity." Id. (citing United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997). With these principles in mind, the Court turns to Defendants' contentions.

### 1. Consent Requested Before Initial Purpose for Stop Ended

Diaz-Fonseca and Montano contend that, by questioning Diaz-Fonseca about matters unrelated to the traffic violation and requesting consent to search the vehicle, the deputies unlawfully prolonged the stop. The government asserts, however, that Defendants' assertions "are not supported by the *facts* of the stop." (Doc. no. 152, p. 3.) The Court finds that the government has the better argument.

To begin with, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States v. Griffin, 696 F.3d 1354, 1362 (11th Cir. 2012) ("[U]nrelated questions posed during a valid Terry stop do not create a Fourth Amendment problem unless they measurably extend the duration of the stop.") (internal quotation marks omitted). In particular, "[a]sking questions while still in the process of writing out a citation or awaiting the response of a computer check . . . does not extend the duration or scope of a valid initial seizure." Garcia, 284 F. App'x at 794; cf. Pruitt, 174 F.3d at 1217-21 (concluding that stop was unlawfully extended where vehicle was pulled over for speeding, but "instead of completing [defendant's] ticket," the officer prolonged the stop to a length of over thirty minutes by questioning the defendant and his passengers about "matters unrelated to the stop" and waiting for a drug dog to arrive on scene).

18

Additionally, it is well established that "[a]n officer conducting a routine traffic stop may request consent to search the vehicle." Purcell, 236 F.3d at 1281 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)); see also United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) ("Once the police had validly detained [the driver], plainly they were entitled under the decisional law to conduct a variety of checks on the driver and his car," including "requesting consent to search the car"). Once a driver has agreed to the search, "the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given." Purcell, 236 F.3d at 1279 n.8.

Here, relying heavily on Pruitt, 174 F.3d at 1219-21, Diaz-Fonseca and Montano assert that the deputies unlawfully prolonged the stop by questioning Diaz-Fonseca after "the investigation of the traffic stop was over." Deputy Land did question Diaz-Fonseca about matters labeled by the defendants as "fishing" – where the two men were going, who the passenger was and why he was nervous, and their itinerary. He did so, however, *while* Deputy Hammond was writing the warning. (FTR 1, 2:44:14-44:39; Gov't's Ex. 20, 5:18:20-21:17.) Deputy Hammond also asked Diaz-Fonseca a few questions, such as whether Diaz-Fonseca's driver's license was current, his age, and the year of his car, but again, he did so while drafting the warning. (FTR 1, 2:45:15-45:25; FTR 2, 3:14:45-15:30; Gov't's Ex. 20, 5:21:17-22:34.) Then, after Diaz-Fonseca signed the warning, in the span of less than *ten seconds* as he was tearing out Diaz-Fonseca's copy of the warning to hand to him, Deputy Hammond asked if Diaz-Fonseca was carrying any contraband and whether the deputies could search his vehicle. (FTR 1, 2:46:35-46:48; FTR 2, 2:21:22-22:04; Gov't's Ex. 20, 5:24:00-24:20.)

The crucial distinction between Pruitt and this case, and why Defendants' reliance on it is misplaced, is that Deputy Hammond did not *delay* in issuing the warning to ask Diaz-

Fonseca questions or to obtain consent to search the vehicle. Rather, he did so as he was completing the process of issuing Diaz-Fonseca a warning for a traffic violation. Cf. 174 F.3d at 1217-18 (officer questioned defendant and his passengers and called for a drug dog to come to the scene "*instead* of completing [defendant's] ticket") (emphasis added). There was simply nothing unlawful about the deputies asking questions and requesting consent to search the vehicle as the warning was completed. See Garcia, 284 F. App'x at 794; Simmons, 172 F.3d at 778. Even if some of the questions were arguably irrelevant to the traffic violation, because they did not cause an extension of the *duration* of the stop, they did not exceed the *scope* of the stop either.[22] See Johnson, 555 U.S. at 333. Accordingly, the request for consent to search was made before the initial reason for the stop – addressing the traffic violation – ended, and the request was thus made during a lawful stop.

### 2. Request for Consent Made After Lawful Extension of Stop Based on Reasonable Suspicion

Diaz-Fonseca and Montano also contend that Diaz-Fonseca's consent was invalid because the deputies had no lawful basis for extending the stop. While the Court has rejected Defendants' argument that the stop was extended in the first place, the Court also finds that the deputies certainly had reasonable suspicion to prolong the stop and conduct further investigation beyond the initial traffic violation.

"[O]nce an officer has briefly stopped a motor vehicle operator for the purpose of

_____

[22] As to the Court's alternative analysis supra, Part III.A.2, that the stop was lawfully initiated based on reasonable suspicion about possible narcotics trafficking, the Court notes that questions about Defendants' itinerary, their business in McDuffie County, and Montano's nervousness were appropriate as part of a brief investigation into that activity. Indeed, as discussed infra, see Part III.B.2, once Defendants were stopped, the deputies obtained additional information to give them reasonable suspicion to conduct a brief investigation into possible narcotics trafficking.

issuing a traffic violation (*i.e.*, a ticket), the officer's continuing detention of the vehicle's occupants is authorized under the Fourth Amendment only if the officer can point to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion'" Pruitt, 174 F.3d at 1219 (quoting United States v. Griffin, 109 F.3d 706, 708 (11th Cir. 1997) (*per curiam*)). Put another way, officers may extend a traffic stop if they acquire reasonable suspicion that the vehicle's occupants are engaged in criminal activity during the stop. Griffin, 109 F.3d at 708.

Applying the standard for reasonable suspicion set forth supra, the deputies here certainly had reasonable suspicion to prolong this traffic stop. See Part III.A.2. As discussed in greater detail above, the deputies had reasonable suspicion to stop the vehicle to investigate possible narcotics trafficking based on the information they had been given about a red Chevrolet traveling eastbound on I-20 that was associated with a person by the name "Fonseca" or "Fonseco." See id. That reasonable suspicion was only bolstered once the vehicle was stopped. Deputy Land observed that the passenger, Montano, was extremely nervous, and he also observed air fresheners and a picture of "La Santa Muerte" hanging from the rearview mirror, the latter of which he had been taught was associated with narcotics trafficking. (FTR 2, 3:13:30-30:55, 3:23:07-23:19, 3:23:19-23:32, 4:16:14-16:40, 4:20:05-20:15.) Equipped with all of that information, the deputies clearly had reasonable suspicion to continue the stop beyond addressing the traffic violation to conduct further investigation about the possible narcotics trafficking. See Pruitt, 174 F.3d at 1219; see also United States v. Pena-Ponce, 588 F.3d 579, 582 (8th Cir. 2009) (noting that Santa Muerte figure, which officer testified was "commonly used by drug traffickers for protection," contributed to reasonable suspicion to prolong vehicle stop).

21

Therefore, even if the Court were to assume *arguendo* that Diaz-Fonseca and Montano were correct that the stop was extended beyond its initial purpose, such an extension was lawful, and Diaz-Fonseca's consent was still requested during a lawful traffic stop. Accordingly, Defendants' argument that the consent to search the vehicle was requested as part of an unlawful detention fails, and the timing of the request provides no grounds for suppressing the evidence discovered during the search.

## C.     Search of Vehicle Lawful[23]

### 1.     Vehicle Searched Pursuant to Valid Consent

Although Diaz-Fonseca did not raise the voluntariness of his consent as an issue in his motion to suppress, his counsel suggested in his cross-examination of Deputy Land that uncertainty about whether he was fluent in both English and Spanish, as well as Deputy Land's lack of knowledge about his level of education, cast doubt on the voluntariness of Diaz-Fonseca's consent.  (FTR 2, 4:42:25-44:15.)

---

[23]As noted earlier, the Court has discussed Diaz-Fonseca's and Montano's motions together.  To that end, while Montano was only a passenger, he was seized for purposes of the Fourth Amendment when the vehicle was stopped, and he thus had a basis under the Fourth Amendment to contest the seizure and to seek suppression of evidence obtained by law enforcement as part of that seizure.  See Brendlin v. California, 551 U.S. 249, 251, 263 (2007); United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) ("As a general rule, the evidence gathered as a result of an unconstitutional stop must be suppressed.").

In this section, however, the Court addresses the inherent validity of the stop, based on questioning conducted by counsel for Diaz-Fonseca at the hearing about the voluntariness of the consent he gave, as well as arguments raised by the government in its response to the motions.  For reasons discussed in greater detail infra, the Court concludes that there is no issue with the legality of the vehicle search itself.  Still, the Court is mindful that, as a passenger with no demonstrated property or possessory interest in the vehicle, Montano does not have a legitimate expectation of privacy in that vehicle, and he thus lacks a legal basis to assert a Fourth Amendment violation with respect to the *inherent* validity of the search.  See, e.g., United States v. Lee, 586 F.3d 859, 864-65 (11th Cir. 2009), *cert. denied*, 130 S.Ct. 2392 (U.S. 2010).

When the government relies on consent to validate a search, it has the burden of proving that the consent was voluntary. Bustamonte, 412 U.S. at 222–23. Specifically, the government must show that, under the totality of the circumstances, the consent was basically a free and unconstrained choice; that is, the person's will was not overborne, and his capacity for self-determination was not critically hampered. United States v. Watson, 423 U.S. 411, 424 (1976); see also United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) ("The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily."). Whether the subject of the search knew he had a right to refuse consent, though a factor to consider, is not controlling. Bustamonte, 412 U.S. at 234. In the Eleventh Circuit, a court examining whether a suspect voluntarily consented to a search should consider the following relevant factors, none of which is dispositive:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

United States v. Welch, 683 F.3d 1304, 1308-09 (11th Cir. 2012) (quoting Blake, 888 F.2d at 798).

Here, the government has met its burden of demonstrating that the consent given was voluntary. As the video of the stop makes plain, the deputies did not use any force or threats against either Diaz-Fonseca or Montano at any point before requesting consent, nor any other tactics or procedures that could be plausibly described as "coercive."[24] Indeed, the deputies'

---

[24]Through questioning of Deputy Land, counsel for Montano suggested at the hearing that the deputies' repeated assurances to Diaz-Fonseca that he was only getting a warning were

23

conversation with Diaz-Fonseca throughout the stop appeared relaxed and genial. Moreover, before having him sign the consent form, Deputy Land told Diaz-Fonseca, in English, that he had "the right to refuse the search." (Gov't's Ex. 19, 5:29:18-29:50.) The form so read in Spanish as well, (see doc. no. 140-2; FTR 2, 4:49:54-52:24), in case Diaz-Fonseca, who stated to the deputies that he was born in the United States and conversed with them in English throughout the stop, (FTR 2, 4:47:20-48:10), did not understand the English explanation he had just been given. See Garcia, 284 F. App'x at 795 (where defendant told the officer that he spoke English and "responded appropriately in English" to the officer's questions, there was "no indication that [he] lacked sufficient comprehension of English to voluntarily consent to the search."). After initially giving the verbal consent, then having the nature of his consent and his right to refuse carefully explained to him by Deputy Land, Diaz-Fonseca did not waver, and he signed the form.

In sum, the Court finds that Diaz-Fonseca's consent, which was requested as part of a lawful stop for the reasons discussed supra, was voluntary, and that the search of the vehicle was therefore lawful pursuant to that consent, which was never modified or revoked. See, e.g.

---

merely a "ruse" and affected the voluntariness of his consent to the search. (FTR 2, 4:35:40-38:22.) As noted above, *Montano* lacks a legal basis for raising such a claim. See supra note 23. In any event, "[t]he substance of the argument asks the Court to hold that police ingratiation violates the Fourth Amendment. This the Court will not do." United States v. Suarez, 694 F. Supp. 926, 940 (S.D. Ga. 1988) (Alaimo, J.) (rejecting argument that a particular officer's "ruse," including being friendly to the driver and only issuing "a mere warning," was an "impermissible misrepresentation" that rendered a subsequent consent to search involuntary), *aff'd*, 885 F.2d 1574 (11th Cir. 1989) (*per curiam*). Significantly, the deputies did not tell Diaz-Fonseca that he would be free to go *after* a search of the vehicle or otherwise misrepresent the consequences of the search. See United States v. Maddox, 316 F. App'x 908, 914 (11th Cir. 2009) (*per curiam*) (recognizing defendant's argument that "consent was invalid because it was based on the deputies' deceitful representation that they would not arrest [defendant] so long as they found no evidence of a major drug operation occurring in the apartment," but rejecting it because the evidence did not support it).

Bustamonte, 412 U.S. at 219 (noting that a warrantless search is reasonable under the Fourth Amendment if it is conducted pursuant to consent).

### 2. Vehicle Searched Pursuant to Automobile Exception

While the Court has concluded that the search at issue in this case was lawful based on Diaz-Fonseca's voluntary consent during a lawful stop, the Court also agrees with the government that the search of the vehicle was lawful regardless of the validity of Diaz-Fonseca's consent. (See doc. no. 152, pp. 4-6.)

"Under the automobile exception, agents may conduct a warrantless search of a vehicle if (1) the vehicle is readily mobile (i.e., operational); and (2) agents have probable cause to believe the vehicle contains contraband or evidence of a crime." United States v. Tamari, 454 F.3d 1259, 1261 (11th Cir. 2006). Of note, "a drug sniff performed during a lawful traffic stop is not a search implicating Fourth Amendment concerns." Id. at 1265 n.6 (citing Illinois v. Caballes, 543 U.S. 405, 410 (2005)). Moreover, "probable cause arises when a drug-trained canine alerts to drugs." Id. at 1265 (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) (per curiam)). Accordingly, pursuant to the automobile exception, when a canine gives a positive alert on a vehicle, officers may conduct a warrantless search of that vehicle. See id.; see also United States v. Wilbur, 458 F. App'x 829, 830 (11th Cir. 2012) (per curiam) ("The drug dog alerted to the presence of drugs in [defendant's] vehicle, which gave the officers probable cause to search the vehicle without a warrant[.]").

Here, as discussed in greater detail above, the deputies lawfully detained Defendants as part of a valid traffic stop, pursuant to both a traffic violation and reasonable suspicion to believe they vehicle may have been involved in narcotics trafficking. See supra Part III.A. Once Defendants were detained, the deputies developed further reasonable suspicion to briefly

25

prolong that detention to investigate their suspicion of narcotics trafficking activity. See supra Part III.B.2. Deputy Land then had his trained canine, which was already on the scene, do a drug sniff, and that did not constitute a search of the vehicle, regardless of whether Diaz-Fonseca consented. See Tamari, 454 F.3d at 1265. Once the canine alerted to the passenger side of the car, reasonable suspicion ripened into probable cause to search the obviously operational vehicle without a warrant. See id. at 1265; Wilbur, 458 F. App'x at 830. In the absence of any indication (or even contention) that the subsequent search was unreasonable, there is no constitutional issue with the resultant seizure of evidence.

In sum, the Court finds that both the initial stop of the vehicle in which Diaz-Fonseca and Montano were traveling and the subsequent search were lawful. Therefore, the Court concludes that there is no basis for suppressing any of the evidence seized as a result of the April 20th stop or the resultant search.

## IV. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Diaz-Fonseca's and Montano's preliminary motions to suppress be deemed **MOOT**, (doc. nos. 127, 128), and that their particularized motions to suppress be **DENIED**, (doc. nos. 139, 140).

SO REPORTED and RECOMMENDED this *14th* day of May, 2013, at Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

26